2010 Ark. 38

**ARKANSAS JUDICIAL DISCIPLINE AND DISABILITY COMMISSION,** Petitioner,

v.

**Honorable Willard PROCTOR, Jr.,** Respondent.

No. 09–738.

Supreme Court of Arkansas.

Jan. 25, 2010.

Judicial Discipline & Disability Commission, by: David A. Stewart, Executive Director, Little Rock, for petitioner.

Austin Porter, Jr., Little Rock, for respondent.

PAUL E. DANIELSON, Justice.

Petitioner Arkansas Judicial Discipline and Disability Commission ("the Commission") has filed with this court its final findings, conclusions, and recommendation, pursuant to Arkansas Judicial Discipline and Disability Commission Rule 12(A) (2009), in which it recommends that this court remove respondent the Honorable Willard Proctor, Jr., from the office of Circuit Judge of the Sixth Judicial District, Fifth Division, of the State of Arkansas. The Commission bases its recommendation of removal on its conclusions that Judge Proctor willfully violated Canons 2, 2(A), 2(B), 3(B)(4), 3(B)(7), 4(A), and 4(C) of the Arkansas Code of Judicial Conduct (2007).[1] We accept the Commission's recommended findings in part, modify them in part, and reject them in part; we accept the Commission's recommendation of removal; and we order Judge Proctor removed.

The instant matter arises from allegations regarding Judge Proctor's involvement in and relationship with a probation-type program, known as Cycle Breakers;[2]

---

1. New canons were adopted by this court and became effective, July 1, 2009. *See In re Arkansas Bar Ass'n Petition to Amend Code of Judicial Conduct,* 2009 Ark. 238 (per curiam). However, the complaints against Judge Proctor were lodged in 2007 and, therefore, involve the 2007 canons.

2. According to a 2007 Legislative Joint Auditing Committee Investigative Report, which was introduced into evidence by the Commission, Cycle Breakers is a program that

was started by [Judge Proctor] through the Court on January 1, 2001, before Cycle Breakers, Inc. existed, and is considered

the impropriety of relationships with defendants within his jurisdiction; and his treatment of his staff. During a hearing before a three-member panel of the Commission, testimony was presented from several witnesses, including several current and former employees of Judge Proctor; a deputy prosecuting attorney from the Pulaski County Prosecutor's Office, who was the former division chief for the Fifth Division; a deputy over the Investigative Special Reporting Section of the Legislative Joint Auditing Committee; a certified public accountant; the attorney for Cycle Breakers, Inc.; a Little Rock City Director; the Pulaski County Civil Attorney; the court administrator of the Pulaski County Clerk's Office; and Judge Proctor himself. Following the hearing, the panel issued its opinion, which included findings of fact and conclusions of law and recommended removal based solely upon the allegations regarding Judge Proctor's contact and interaction with one specific defendant in his court, Demoreo Davis. Specifically, the three-member panel concluded:

Given all of that which is before the full commission, it is our belief that there is compelling proof, and there are, as well, compelling reasons for Judge Proctor to be removed from the bench for the Demoreo Davis allegations alone. The contact and interaction the judge had with Demoreo Davis, alone in his

home, alone in car rides, in the office, and, most of all, in the fact and in the manner that Proctor sent money to him at the ADC are beyond reproach. These allegations alone require this three-member panel to find unanimously that Judge Willard Proctor, Jr. should be removed from the bench.

If the Demoreo Davis allegations are not accepted by the full Commission or by the Arkansas Supreme Court for any reason, which we find there is none, there are other remaining allegations that we have found as fact and have concluded as violations of law. It is our belief that while actionable as misconduct, there are modes of punishment more measured and less drastic than removal that could address and sanction the allegations sustained. All of the problems set forth within the complaints before us occurred while Proctor disposed of a criminal docket, not a civil docket. A lesser punishment that seems fitting to us for the remainder of the allegations would be a six-month suspension from the bench, without pay for three months, with pay for three months, as well as a fine or assessment of $25,000.00 to be paid for the costs of the staff's investigation and prosecution of this petition and these cases, and a directive from the Arkansas Supreme Court that Judge Proctor be relieved of conducting criminal and juvenile dockets

part of Court probation. The mission of the Program is to aggressively intervene in lives of individuals to stop the cycle of crime and deter further involvement in the judicial system. The Program uses time a defendant is under the Court's jurisdiction to affect change in the individual's lifestyle, behavior, and decision-making ability through intensive supervision.

Non-violent, first-time Court offenders placed on probation are usually required to participate in the Program, without a participation fee, as a condition of their proba-

tion. County Probation Officers evaluate defendants, assist in developing individuals' case plans, goals, and objectives, and match Program participants with mentors. Mentors are past participants who have successfully completed the Program or community volunteers.

To meet the Program's objectives, participants are required to make contact with mentors, attend mandatory monthly/quarterly meetings, submit to random drug testing, and perform community service.

so long as he serves as a judge in this state, restricting his caseload to handling civil and/or probate matters only.

In accordance with the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission (2007), the full commission reviewed the panel's decision and entered its own findings of fact, conclusions of law, and recommendation. Specifically, the Commission found the following violations of the judicial canons:

1. Judge Proctor willfully violated Canon 2(B) by preparing a "profit & loss" statement for his Division and sending it to the bank for a determination of the credit worthiness of Cycle Breakers, Inc.

2. Judge Proctor served as an officer, director, trustee or non-legal advisor of an organization that was be [sic] engaged in proceedings that ordinarily came before the judge in violation of Canon 4(C).

3. Judge Proctor willfully violated Canon 4(C) by lending the prestige of his office to a private corporation by preparing a "profit & loss" statement for his Division and sending it to the bank for a determination of the credit worthiness of Cycle Breakers, Inc.

4. Judge Proctor willfully violated Canon 4(A) of the Code by involving himself in the operation of Cycle Breakers, Inc. to the extent that it cast reasonable doubt on the judge's capacity to act impartially as a judge.

5. Judge Proctor willfully violated Canon 4(A) of the Code by personally involving himself with party defendants in his Court to the extent that it cast reasonable doubt on the judge's capacity to act impartially as a judge.

6. Judge Proctor willfully violated Canon 2 by failing to avoid the appearance of impropriety by sending money to a convicted robber that he sentenced to the Department of Corrections [sic].

7. Judge Proctor willfully violated Canon 2 by failing to avoid the appearance of impropriety by allowing a party defendant in his Court to live at the Judge's personal residence for over a week.

8. Judge Proctor willfully violated Canon 2 by failing to avoid the appearance of impropriety by allowing a party defendant in his Court to live at the Judge's personal residence on certain weekends.

9. Judge Proctor willfully violated Canon 2 by failing to avoid the appearance of impropriety by giving rides in his personal vehicle to at least eight (8) party defendants.

10. Judge Proctor willfully violated Canon 2 by failing to avoid the appearance of impropriety by having inappropriate contact with party defendants subject to his jurisdiction, by collecting money from them in open court and eating lunch and visiting with them in chambers.

11. Judge Proctor willfully violated Canon 3(B)(7) by engaging in ex parte contact with party defendants subject to his jurisdiction, by giving them car rides, by visiting with them at Cycle Breaker [sic] meetings, and by visiting with them in the courthouse outside of a court setting without counsel or the State present.

12. Judge Proctor willfully violated Canon 4(A) of the Code by stating that he knew he might lose his judicial office based on his actions regarding party defendants subject to his jurisdiction.

13. Judge Proctor willfully violated Canon 4(A) of the Code by allowing his personal interests regarding rehabilitating criminals to be superior to his sworn duty as a judge.

14. Judge Proctor willfully violated Canon 3(B)(4) by coercing his staff into working for Cycle Breakers, Inc.

15. Judge Proctor willfully violated Canon 2(A) of the Code by failing to respect and comply with the law by ignoring and by-passing laws that were an impediment to his interest in Cycle Breakers, Inc.

16. Judge Proctor willfully violated Canon 2(A) of the Code by failing to respect and comply with the law by enforcing payment of "civil fees" from these defendants with the jail [sic] or with the threat of jail, knowing the money would go to his non-profit corporation.

The Commission then made the following recommendation to this court:

Given all of that which is before the full commission, it is our belief that there is clear and convincing evidence and proof, and there are, as well, compelling reasons for Judge Proctor to be removed from the bench.

We must determine whether to accept the Commission's recommended findings and recommendation of removal.[3]

Based upon a review of the entire record, this court shall file a written opinion and judgment directing such disciplinary action as it finds just and proper. *See* Ark. Jud. Discipline & Disability Comm'n R. 12(E) (2009). We may accept, reject, or modify in whole or in part, the findings and recommendation of the Commission. *See id. See also Judicial Discipline & Disability Comm'n v. Simes,* 2009 Ark. 543, 354 S.W.3d 72. This is a matter requiring de novo review, and we will not reverse the Commission's findings unless

they are clearly erroneous. *See Judicial Discipline & Disability Comm'n v. Thompson,* 341 Ark. 253, 16 S.W.3d 212 (2000).

### I. Impropriety of Relationships with Defendants

At issue, first, is whether Judge Proctor had relationships of an improper nature with defendants subject to his jurisdiction. The Commission concluded that he did, and it found that Judge Proctor's conduct violated Canons 2, 3(B)(7), and 4(A).

### A. Canon 2

Canon 2 of the Arkansas Code of Judicial Conduct provides that "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." Ark.Code Jud. Conduct Canon 2 (2007). Here, the Commission made several findings regarding Judge Proctor's relationships with defendants, which it concluded were violative of Canon 2. Specifically, the Commission made findings that Judge Proctor failed to avoid the appearance of impropriety by: (1) sending money to a convicted robber that he had sentenced to the Department of Correction ("ADC"); (2) allowing a party defendant in his court to live at his personal residence for over a week; (3) allowing a party defendant in his court to live at his personal residence on certain weekends; (4) giving rides in his personal vehicle to at least eight party defendants; and (5) having inappropriate contact with party defendants subject to his jurisdiction by collecting money from them in open court, eating lunch with them, and visiting with them in chambers. It further concluded that each course of

---

3. We note that the Commission did not state in its findings, nor in the hearing during which it deliberated, that it adopted, in whole or in part, the three-member panel's findings, nor was the Commission able to cite this

court to any such language during oral argument. While the findings of the full Commission are substantially similar to those of the panel, there is no indication that the full Commission indeed adopted the panel's findings.

conduct constituted a willful violation of Canon 2.

The commentary to Canon 2 provides that a judge must avoid all impropriety and appearance of impropriety.[4] *See* Commentary, Ark.Code Jud. Conduct Canon 2(A). It further provides that the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired. *See id.*

*1. Sending of money to an incarcerated defendant sentenced by Judge Proctor*

■ ₆Judge Proctor, in his brief before this court, argues that his sending money to Demoreo Davis did not violate Canon 2 because Judge Proctor had lost jurisdiction over Mr. Davis by the time the money was sent. Judge Proctor's argument, however, is misplaced. We must determine, as set forth above, whether Judge Proctor's conduct, *i.e.,* sending money to a defendant sentenced to prison by Judge Proctor, would create in reasonable minds a perception that Judge Proctor's ability to carry out his judicial responsibilities with integrity, impartiality, and competence was impaired. We hold that it would.

Judge Proctor admitted making several deposits, between 2006 and 2008 and totaling approximately $450, to Mr. Davis's account with ADC. He further admitted that Mr. Davis had been convicted in his court and that he had signed the judgment and commitment order. Judge Proctor testified that the two of them exchanged letters while Mr. Davis was incarcerated and that Mr. Davis had asked him in a letter if he could send Mr. Davis some money.

Judge Proctor stated that he thought it looked "okay" to the public for a sentencing judge to send money to a defendant sentenced by that judge. He testified that not only had he lost jurisdiction over Mr. Davis's case, but that, while he was not trying to hide his assistance, no one in the public would have known about the deposits.

Judge Proctor's arguments are unavailing, as it is patently clear that a judge's deposit of money into the account of a defendant incarcerated by that judge, irrespective of whether that judge retained jurisdiction, would create in reasonable minds a perception that the judge's ₉ability to carry out his judicial responsibilities with integrity, impartiality, and competence is impaired. We, therefore, hold that the Commission's finding that Judge Proctor's sending money to Mr. Davis's ADC account was a willful violation of Canon 2 is not clearly erroneous, and we accept it.

*2. Allowing a party defendant to live at Judge Proctor's residence for over a week*

■ Judge Proctor does not dispute that Mr. Davis stayed with him, and the evidence before the Commission demonstrates that its finding on this issue is not clearly erroneous. Judge Proctor admitted that Mr. Davis stayed with him at his home for over a week. He testified that Mr. Davis stayed in a spare bedroom and that the two of them watched television together, ate dinner together, and drove into the office together. Again, it is clear to this court that such conduct would create in reasonable minds a perception that Judge Proctor's ability to carry out his judicial responsibilities with integrity, im-

---

**4.** While the commentary to the canon is not controlling over the canon's clear language, it is a highly persuasive aid to construing the canon. *See Huffman v. Arkansas Judicial Discipline & Disability Comm'n,* 344 Ark. 274, 42 S.W.3d 386 (2001).

partiality, and competence was impaired, because Mr. Davis was a defendant under Judge Proctor's jurisdiction. We cannot say that the Commission's finding that such willful conduct violated Canon 2 is clearly erroneous, and we accept the finding.

### 3. Allowing a party defendant to live at Judge Proctor's personal residence on certain weekends

■ As was the case with the prior finding, Judge Proctor does not appear to take issue with the Commission's finding that he allowed a party defendant to live at his home on certain weekends. And again, the evidence demonstrates that the Commission's finding that such conduct violated Canon 2 is not clearly erroneous.

Zane Chrisman, Judge Proctor's former law clerk, testified that Judge Proctor told her that "he would take Demoreo Davis back to his house on a Friday and would sit on him to keep him from getting high on the weekends." She testified that Judge Proctor told her that "if anybody knew that he could lose his license or lose his judgeship." Judge Proctor himself testified that Mr. Davis came to his house, sometimes two times a month. He admitted that there were times that he took Mr. Davis home with him for a weekend to ensure that he did not get high or in trouble.

Again, such conduct would clearly create in reasonable minds a perception that Judge Proctor's ability to carry out his judicial responsibilities with integrity, impartiality, and competence is impaired. Accordingly, we cannot say that the Commission's finding that such willful conduct was violative of Canon 2 is clearly erroneous, and we accept it.

### 4. Rides given in Judge Proctor's personal vehicle to eight party defendants

■ Judge Proctor challenges this finding by the Commission solely on a procedural basis, which will be discussed later in this opinion. Notwithstanding his failure to challenge the Commission's finding substantively, it is clear that the finding is not clearly erroneous.

Sally Porter, Judge Proctor's former trial assistant, case coordinator, and office manager, testified that on several mornings, she saw Judge Proctor and Mr. Davis getting out of the car together. In addition, she testified, Judge Proctor drove Mr. Davis to lunch on occasion. With respect to other defendants, Judge Proctor testified that he had given rides to the following in his personal car: Willie Coleman, Ernest McCuen, Robert McGee, Mahoney Steele, Frances Elton, Jaslyn McCrary, and Tiwana White. He further testified that he gave these individuals rides in his car while they were on probation in his court. Finally, Judge Proctor agreed that giving such rides was not appropriate for a sitting judge.

Again, applying the test for appearance of impropriety, it is clear to this court that Judge Proctor's practice of giving rides to defendants in his personal car violated Canon 2. Indeed, Judge Proctor admitted on the record that such behavior was inappropriate. Accordingly, we hold that the Commission's finding that Judge Proctor's giving rides to party defendants in his personal car was a willful violation of Canon 2 is not clearly erroneous, and we accept it.

### 5. Collection of money by Judge Proctor from party defendants, eating lunch with them, and visiting with them in chambers

Judge Proctor does not address substantively the allegations that he ate lunch with party defendants and visited with them in chambers. However, he does dispute the

allegation that he collected money from them.

### a. collection of money from party defendants

■ In his brief, Judge Proctor admits that he had contact with probationers when he collected money, but contends that his conduct did not violate Canon 2 because it was authorized by statute, specifically, Arkansas Code Annotated § 16–13–703. We disagree.

The record reveals testimony by Captain Richard Day, Judge Proctor's bailiff, that he observed Judge Proctor collecting both money and fees, such as probation fees, Cycle Breakers fees, missed-meeting fees, and drug fees, in open court. Kenny Haskin, Judge Proctor's former chief probation officer, testified that he saw Judge Proctor collect fees on occasion, and Tonia Goolsby, a prosecutor who served as the division chief for the Pulaski County Prosecutor's Office for Fifth Division, testified that she saw Judge Proctor collecting cash at a show-cause docket she attended.

Such conduct does not pass the test for appearance of impropriety. Nor does the statute relied upon by Judge Proctor cure the appearance of impropriety. The subsections of section 16–13–703, as cited by Judge Proctor, provide in pertinent part:

(a) When a defendant sentenced to pay a fine defaults in the payment thereof, or of any installment, the court, upon its own motion or that of the prosecuting attorney, may require him or her to show cause why he or she should not be imprisoned for nonpayment.

(b) The court may issue a warrant of arrest or summons for his or her appearance.

(c)(1) Unless the defendant shows that his or her default was not attributable to a purposeful refusal to obey the sentence of the court or to a failure on his or her part to make a good-faith effort to obtain the funds required for payment, the court may order the defendant imprisoned in the county jail or other authorized institution designated by the court until the fine or specified part thereof is paid.

Ark.Code Ann. § 16–13–703(a)–(c)(1) (Supp.2009). The plain language of the statute authorizes a circuit court to require a defendant sentenced to pay a fine to show cause where there is nonpayment; to issue a warrant or summons for the defendant's appearance; and, in certain circumstances, to order a defendant imprisoned until the nonpaid fine or specified part thereof is paid. However, none of the subsections relied upon by Judge Proctor authorize a circuit court to collect the fine itself. Because it is clear to this court that Judge Proctor's collection of money from defendants in open court would create in reasonable minds a perception that his ability to carry out his judicial responsibilities with integrity, impartiality, and competence is impaired, we cannot say that the Commission's finding that Judge Proctor's willful conduct violated Canon 2 is clearly erroneous, and we accept it.

### b. eating lunch with defendants in chambers

■ The Commission concluded that Judge Proctor's conduct of eating lunch in chambers with defendants subject to his jurisdiction violated Canon 2. We agree.

Here, Captain Day testified that he saw probationers eating lunch with Judge Proctor in the judge's office on several occasions. Sally Porter testified that she heard Judge Proctor ask probationers where they wanted to eat that day. She testified that Judge Proctor drove Mr. Davis to lunch on occasion and that the two of them ate lunch in the office on occasion. Kenny Haskin also testified that

probationers ate lunch with Judge Proctor on occasion at the office, and LaShannon Robinson, Judge Proctor's case coordinator, testified to the same.

Judge Proctor does not dispute the fact that he ate lunch with probationers. In fact, he, too, testified that there were occasions on which he would eat lunch with them in the office. We simply cannot say that such conduct passes the test for appearance of impropriety. Certainly, a judge's eating lunch, in or outside of his office, with defendants within his jurisdiction would create in reasonable minds the perception that that judge's ability to carry out his judicial responsibilities with integrity, impartiality, and competence is impaired. Accordingly, we cannot say that the Commission's conclusion that such willful conduct violated Canon 2 is clearly erroneous, and we accept it.

### c. visiting with defendants in chambers

The Commission further found that Judge Proctor's conduct of visiting with defendants in chambers was violative of Canon 2. We agree. As already set forth above, it is clear that Judge Proctor lunched with probationers in the office on occasion. In addition, Captain Day testified that he saw probationers interact with Judge Proctor in the office. Sally Porter testified that she saw Judge Proctor participating in discussions with probationers in the Fifth Division offices. She also testified that she saw probationers talking to Judge Proctor one-on-one on a daily basis. Ms. Porter testified that Judge Proctor gave probationers his direct office number and that he indicated to her that he took calls from them. Judge Proctor further admitted that probationers called him on his office phone.

Such conduct, in our view, gave the appearance of impropriety. Certainly, Judge Proctor's visiting with defendants in chambers would create in reasonable minds a perception that his ability to carry out his judicial responsibilities with integrity, impartiality, and competence is impaired. Accordingly, we cannot say that the Commission's finding on this willful violation is clearly erroneous, and we accept it.

### B. Canon 3(B)(7)

Canon 3(B)(7) provides:

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(ii) the judge makes provisions promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

(c) A judge may consult with court personnel whose function is to aid the

judge in carrying out the judge's adjudicative responsibilities or with other judges.

(d) A judge may indicate or consider any ex parte communications when expressly authorized by law to do so.

Ark.Code Jud. Conduct Canon 3(B)(7) (2007). The commentary to the canon provides, further, that "[i]n general, ... a judge must discourage ex parte communication and allow it only if all the criteria stated in Section 3(B)(7) are clearly met." Commentary, Ark.Code Jud. Conduct Canon 3(B)(7). Here, the Commission concluded that Judge Proctor's giving defendants rides in his car, visiting with defendants at Cycle Breakers meetings, and visiting with defendants in the courthouse outside of a court setting without counsel or the State present constituted ex parte communications with defendants subject to his jurisdiction, in violation of Canon 3(B)(7). We agree.

As already set forth above, Judge Proctor gave defendants rides in his personal vehicles on several occasions. In addition, Judge Proctor admitted that he talked and shared with probationers during daily meetings at the Chem–Free house, a facility that was a part of Cycle Breakers. Zane Chrisman testified that Judge Proctor was at all the Cycle Breakers meetings that she could remember and that "defendants would come up to him if they had questions about their case."

Further, Captain Day testified that Judge Proctor led Bible studies in the courtroom after hours with then-current probationers. He stated that he observed the probationers sharing their thoughts with Judge Proctor. Sally Porter also testified that Judge Proctor conducted Bible studies with then-current probationers in the Fifth Division offices. She stated that she observed Judge Proctor participating in discussions with those probationers during those Bible studies.

Additionally, Zane Chrisman testified that probationers were "around" the Fifth Division offices "quite a bit." LaShannon Robinson testified that probationers were in the Fifth Division offices "[d]aily or weekly." She testified that they would run errands, move boxes, "whatever [Judge Proctor] asked them to do." Tonia Goolsby testified that Judge Proctor encouraged defendants to have direct contact with him. She also testified that defendants were commonly in the court's staff offices. Indeed, Judge Proctor admitted that probationers were in and around his offices "[s]ometimes on a daily basis." He testified that they did jury mailouts for the court and took deposits to the bank.

It is clear from the testimony before the Commission that Judge Proctor engaged in and permitted ex parte communications with then-current defendants subject to his jurisdiction in violation of Canon 3(B)(7). Moreover, it is evident that the ex parte communications do not fall within the exceptions set forth in the canon, as they were not for scheduling, administrative purposes, or emergencies. Even if the ex parte communications could be considered administrative, there was no evidence that Judge Proctor complied with the canon in making provisions promptly to notify all other parties of the substance of the ex parte communications and in allowing an opportunity to respond. Nor were the communications with a disinterested expert on the law, with court personnel, or authorized by the law. For these reasons, the Commission's finding that Judge Proctor's conduct of willfully engaging in ex parte communications is not clearly erroneous, and we accept it.

### C. Canon 4(A)

The Commission further found that Judge Proctor willfully violated Canon

4(A) by stating that he knew he might lose his judicial office based on his actions regarding defendants subject to his jurisdiction and by allowing his personal interests regarding rehabilitating criminals to be superior to his sworn duty as a judge. Canon 4(A) relates to a judge's extrajudicial activities and subsection (A) provides:

A. *Extra-judicial Activities in General.* A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(1) cast reasonable doubt on the judge's capacity to act impartially as a judge;

(2) demean the judicial office; or

(3) interfere with the proper performance of judicial duties.

Ark.Code Jud. Conduct Canon 4(A).

*1. Statements by Judge Proctor that he might lose his judicial office*

■ This canon, by its plain language, pertains to a judge's extrajudicial activities. Certainly, Judge Proctor's involvement with the Cycle Breakers program would be considered an extrajudicial activity. In this case, a video was presented to the Commission of Judge Proctor speaking at a Cycle Breakers awards ceremony. During that speech, Judge Proctor made comments regarding his involvement with Mr. Davis and stated that, as a result of that involvement, his judgeship was under "question and scrutiny." He then stated that even if he were to lose his judgeship over the matter, "it would be worth it." The question presented, then, is when Judge Proctor made his statement regarding the loss of his judicial office, did he conduct his extrajudicial activity such that it did not cast a reasonable doubt on his capacity to act impartially as a judge?

It is reasonable to construe Judge Proctor's statement as one of indifference toward his judicial obligations. Yet, the commentary to the canon provides, in pertinent part, that "[e]xpressions of bias or prejudice by a judge, even outside the judge's judicial activities, may cast reasonable doubt on the judge's capacity to act impartially as a judge." Commentary, Ark.Code Jud. Conduct Canon 4(A). While the commentary in no way limits expressions to bias or prejudice, even those expressions only "may" cast reasonable doubt. They do not per se cast reasonable doubt. Accordingly, because Judge Proctor's statement merely rises to the level of indifference, we cannot say that it cast reasonable doubt on his capacity to act impartially.[5] Therefore, we hold that the Commission's conclusion that Judge Proctor's statement violated Canon 4(A) is clearly erroneous, and we reject it.[6]

*2. Allowing personal interests to be superior to sworn duty as a judge*

■ Judge Proctor argues that his motives were pure and therefore justified him having these extrajudicial contacts with probationers. Such an argument demonstrates Judge Proctor's belief that his duties as a judge are subordinate to his personal beliefs. Canon 4(A)(3)'s plain language requires that a judge conduct his extrajudicial activities so that they do not interfere with the proper performance of

**5.** Because the Commission failed to specify which subsection of Canon 4A Judge Proctor's conduct violated, we have reviewed his conduct under the subsection we determined most applicable. Judge Proctor's statement that he might lose his judicial office based on his actions does not appear alone to demean the judicial office, nor interfere with the proper performance of judicial duties. Therefore, we have analyzed the finding under Canon 4(A)(1).

**6.** We note that this rejection in no way precludes us from considering the statements in the context of other violations.

his judicial duties. Judge Proctor's continuous, inappropriate conduct with probationers, both inside and outside of the courtroom, demonstrates that Judge Proctor put his personal beliefs above his judicial duties. Accordingly, we hold that the Commission's finding that Judge Proctor allowed his personal interests in rehabilitating criminals to be superior to his judicial duties was a willful violation of Canon 4(A) is not clearly erroneous, and we accept it.

## II. Involvement with Cycle Breakers

The next issue for this court's consideration is the propriety of Judge Proctor's involvement with and relationship to the Cycle Breakers program. The Commission found that Judge Proctor's involvement in Cycle Breakers was improper and violated Canons 2(B), 4(A), and 4(C).

## A. Canon 2(B)

Canon 2(B) provides:

A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

Ark.Code Jud. Conduct Canon 2(B). Here, the Commission found that Judge Proctor prepared a "profit & loss" statement for the Fifth Division Circuit Court and sent it to the bank for a determination of Cycle Breakers, Inc.'s credit worthiness, and it concluded that such conduct willfully violated Canon 2(B). Judge Proctor takes issue with this finding, not disputing that he prepared the statement, but arguing that the finding is clearly erroneous because the document he provided to the bank was a record used to provide accounting information to the Pulaski County Clerk. He claims that the record was generated from software he helped create and that it was the most accurate source of information regarding fees because it tracked all payments made by probationers to both Pulaski County and Cycle Breakers. For these reasons, he asserts, it was not improper for him to provide the information to the bank. Judge Proctor's contentions are misplaced, as it matters not what was presented or why.

It is clear from the record that Judge Proctor presented a profit and loss statement, as evidenced by his admission thereto during the following colloquy:

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: And then you present historical profit and loss statements out of your division to the bank, correct?

JUDGE PROCTOR: That's right. I sure did.

Judge Proctor further admitted that he presented the statement so that the bank could rely upon it to determine how much money would be available to pay on a mortgage Cycle Breakers was seeking. By making such a presentation while a judge, no matter the reason, Judge Proctor lent the prestige of judicial office to advance the private interests of Cycle Breakers, Inc., which is a clear violation of Canon 2(B). Therefore, we hold that the Commission's finding that Judge Proctor willfully violated Canon 2(B) on this basis is not clearly erroneous, and we accept it.

## B. Canon 4(A)

The Commission further found that Judge Proctor willfully violated Canon 4(A) in two ways: (1) he involved himself in the operation of Cycle Breakers, Inc., to the extent that it cast reasonable doubt on his capacity to act impartially as a judge; and (2) he involved himself personally with

party defendants in his court to the extent that it cast reasonable doubt on his capacity to act impartially as a judge. As already set forth above, Canon 4(A) provides:

> A. *Extra-judicial Activities in General.* A judge shall conduct all of the judge's extrajudicial activities so that they do not:
>
>> (1) cast reasonable doubt on the judge's capacity to act impartially as a judge;
>>
>> (2) demean the judicial office; or
>>
>> (3) interfere with the proper performance of judicial duties.

Ark.Code Jud. Conduct Canon 4(A).

*1. Involvement in the operation of Cycle Breakers, Inc.*

■ The evidence before the Commission amply demonstrates that Judge Proctor was involved in the operation of Cycle Breakers, Inc.[7] The question, then, is did his involvement cast a reasonable doubt on his capacity to act impartially as a judge? We conclude that it did.

Captain Richard Day testified that he saw Judge Proctor involved in Cycle Breakers activities, such as "[c]onferencing, financial, consulting, counseling, all of them." He stated that Judge Proctor collected both money and fees, including probation fees, Cycle Breakers fees, missed-meeting fees, and drug fees.[8] He further testified that Judge Proctor talked with probationers, taught classes to current probationers, and had computer programs on his office computer for Cycle Breakers,

Inc.'s finances. In addition, he testified that Judge Proctor stated at a Cycle Breakers staff retreat that Cycle Breakers's goal was to collect $250,000 in fees.

Zane Chrisman testified that Judge Proctor was present at certain Cycle Breakers meetings and that, while there, defendants would ask him questions about their cases. She testified that Judge Proctor had access to blank Cycle Breakers checks and that she saw him involved in activities with Cycle Breakers money. She further testified that she made deposits for Cycle Breakers, Inc., and that the Cycle Breakers, Inc. checkbook was kept in his office.

Bruce Engstrom, a certified public accountant testifying for the Commission, stated that, on Cycle Breakers, Inc. tax returns for 2003 and 2004, Judge Proctor was listed as an officer, director, trustee, and key employee. In addition, bank statements for Cycle Breakers, Inc., were mailed to Judge Proctor's office, its address on a tax return was the same as Judge Proctor's office, and its webpage was listed as www.co.pulaski.ar.us/fifth divisioncircuit.

Alice Abson, who at one time served as director of Cycle Breakers while a full-time employee of Fifth Division,[9] testified that Judge Proctor took over the responsibilities for the Cycle Breakers account. She stated that he decided what were necessary purchases for Cycle Breakers and that he conducted and ran the mandatory, quarterly meetings for probationers. She

---

7. It appears that there is no real distinction between Cycle Breakers and Cycle Breakers, Inc. During his testimony before the Commission, Judge Proctor agreed that Cycle Breakers and Cycle Breakers, Inc. "shared the exact same purposes, goals, principles, things of that nature" and that they "mirrored each other."

8. Captain Day described the missed-meeting fee as a hundred-dollar fee that any probationer who failed to attend a Cycle Breakers or mandatory meeting was fined. He described a drug fee as the cost for having a drug test performed.

9. Ms. Abson testified that she was paid through the county.

testified that Judge Proctor was in charge of the minutes for the Cycle Breakers, Inc. board meetings and that he would take them and type them. Ms. Abson further testified that Judge Proctor would go to the Cycle Breakers board and make requests for certain purchases, for which he would receive permission. In addition, she testified that she and Judge Proctor met with community leaders, church leaders, and leaders of other civic organizations on behalf of the Cycle Breakers program. She stated that Judge Proctor appointed Sally Porter as comptroller of Cycle Breakers and that Ms. Abson and Judge Proctor set up the bank accounts for Cycle Breakers, Inc.

Finally, Judge Proctor himself admitted to his involvement with Cycle Breakers. While claiming it was a mistake, Judge Proctor admitted being listed on at least two Cycle Breakers tax returns as an officer. He stated that he attended eighty-five percent or more of the Cycle Breakers monthly meetings, as well as the annual meetings of Cycle Breakers, Inc. He admitted to preparing annual minutes for Cycle Breakers, Inc., to opening its annual meetings in 2004 and 2005, and to giving a history of the organization at its 2005 and 2006 meetings. He admitted that his name, office address, and email were listed on the Cycle Breakers website and that there were blank and signed Cycle Breakers checks kept in a locked file in his office.

In addition, Judge Proctor admitted to hosting Cycle Breakers, Inc.'s board of directors; obtaining services for volunteers, mentors, security, catering, and speakers for Cycle Breakers, Inc.; serving as master of ceremonies for Cycle Breakers quarterly meetings; serving as host for its annual meetings; paying bills for expenses of Cycle Breakers, Inc.'s operations; creating computer software used by Cycle Breakers, Inc.; and helping to prepare and clean the Chem–Free house.

Here, the foregoing testimony clearly sets forth Judge Proctor's involvement with Cycle Breakers. In addition, Judge Proctor agreed that ninety-nine percent of the people in the Cycle Breakers program were there under his authority from the Fifth Division. These facts, accordingly, support the Commission's finding that Judge Proctor willfully violated Canon 4(A) by involving himself in the operation of Cycle Breakers, Inc., to the extent that it cast reasonable doubt on his capacity to act impartially as a judge. We hold that the finding is not clearly erroneous, and we accept it.

*2. Involvement with party defendants*

As already set forth in this opinion, Judge Proctor admitted making several deposits into the ADC account of a defendant convicted in his court. He permitted this same defendant to stay in his home, and he gave several defendants rides in his personal vehicle. In addition, Sally Porter testified that Judge Proctor led Bible studies for probationers and that he took probationers with him to church. Judge Proctor testified that he hosted a function at his home that probationers attended and at which he was present. He further testified that he baptized some persons who were current probationers and that he allowed some probationers to work on his home as part of an entrepreneurial project for Cycle Breakers, Inc. Judge Proctor admitted that Demoreo Davis, a probationer, called him on his cell phone, and that he personally reimbursed an employee for buying Mr. Davis clothes.

Without question, such extrajudicial activities cast reasonable doubt on Judge Proctor's capacity to act impartially as a judge. Accordingly, we cannot say that this finding of a willful violation by the

Commission is clearly erroneous, and we accept it.

*C. Canon 4(C)*

With respect to Canon 4(C), the Commission found two violations by Judge Proctor: (1) that he served as an officer, director, trustee, or nonlegal advisor of an organization that was engaged in proceedings that ordinarily came before the judge; and (2) that he willfully lent the prestige of judicial office to a private corporation by preparing a "profit and loss" statement for the Fifth Division and sending it to a bank for a determination of the credit worthiness of Cycle Breakers, Inc. Canon 4(C) provides:

C. *Governmental, Civic or Charitable Activities*

(1) A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice. (Amended July 1, 2004)

(2) A judge shall not accept appointment to a governmental committee or commission or other governmental position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system or the administration of justice. A judge may, however, represent a country, state or locality on ceremonial occasions or in connection with historical, educational or cultural activities.

(3) A judge may serve as an officer, director, trustee or non-legal advisor of an organization or governmental agency devoted to the improvement of the law, the legal system or the administration of justice or of an educational, religious, charitable, fraternal or civic organization not conducted for profit, subject to the following limitations and the other requirements of this Code.

(a) A judge shall not serve as an officer, director, trustee or non-legal advisor if it is likely that the organization

(i) will be engaged in proceedings that would ordinarily come before the judge, or

(ii) will be engaged frequently in adversary proceedings in the court of which the judge is a member or in any court subject to the appellate jurisdiction of the court of which the judge is a member.

(b) A judge as an officer, director, trustee or non-legal advisor, or as a member or otherwise:

(i) may assist such an organization in planning fund-raising and may participate in the management and investment of the organization's funds, but shall not personally participate in the solicitation of funds or other fund-raising activities, except that a judge may solicit from other judges over whom the judge does not exercise supervisory or appellate authority;

(ii) may make recommendations to public and private fund-granting organizations on projects and programs concerning the law, the legal system or the administration of justice;

(iii) shall not personally participate in membership solicitation if the solicitation might reasonably be perceived as coercive or, except as permitted in Section 4C(3)(b)(i), if the membership solicitation is essentially a fund-raising mechanism;

(iv) shall not use or permit the use of the prestige of judicial office for fund-raising or membership solicitation.

Ark.Code Jud. Conduct Canon 4(C).

*1. Service as an officer, director, trustee, or nonlegal advisor*

It appears that the Commission's finding is that Judge Proctor violated Canon

4(C)(3)(a)(i), which is set forth above. Thus, we must examine: (1) whether Judge Proctor served as an officer, director, trustee, or nonlegal advisor to Cycle Breakers, Inc., and (2) whether Cycle Breakers, Inc., was likely to be engaged in proceedings that would ordinarily come before him.

 Indeed, Bruce Engstrom testified, and Judge Proctor admitted, that Judge Proctor was listed on two Cycle Breakers tax returns as "officer, director, trustee, and key employee." Moreover, based on the facts set forth earlier, it is clear that Judge Proctor acted in some capacity on behalf of Cycle Breakers, as evidenced by his control over the Cycle Breakers checking account and checks; his acceptance of Cycle Breakers fees; his participation in seeking mentors for the program; his presentations to Cycle Breakers participants; his presence at, participation in, and presentations during Cycle Breakers board meetings; and his payment of bills for expenses of Cycle Breakers. Accordingly, such involvement indicates Judge Proctor's service as an officer, director, trustee, or nonlegal advisor to Cycle Breakers.

 However, to accept the Commission's finding on this violation, we must also determine that it was likely that Cycle Breakers would be engaged in proceedings that would ordinarily come before Judge Proctor. Here, Judge Proctor testified that he had fifteen percent of the total criminal docket for the Sixth Judicial District. Kenny Haskin, who served as Judge Proctor's chief probation officer, testified that the purpose of Cycle Breakers was to "provide rehabilitation type services to probationers who are on probation through Fifth Division." In light of this testimony, there is no doubt that it was likely that Cycle Breakers would be engaged in proceedings that would ordinarily come be-

fore Judge Proctor. And, again, Judge Proctor admitted that ninety-nine percent of the people in Cycle Breakers were there under his authority from the Fifth Division. Thus, Cycle Breakers was indeed engaged in proceedings that ordinarily came before Judge Proctor. Because it is clear from the evidence before the Commission that Judge Proctor served, at a minimum, as a nonlegal advisor to Cycle Breakers, an organization that was likely to be, and was, engaged in proceedings that would ordinarily come before Judge Proctor, the Commission's finding that such conduct violated Canon 4(C) is not clearly erroneous, and we accept it.

*2. Preparation of a profit and loss statement*

 As already set forth previously, Judge Proctor admitted presenting a profit and loss statement to the bank, and by virtue of doing so while a judge, lent the prestige of judicial office to Cycle Breakers. Arkansas Code of Judicial Conduct Canon 4(C)(3)(b)(iv) precludes a judge as an officer, director, trustee, or nonlegal advisor from using or permitting the use of the prestige of judicial office for fundraising or membership solicitation. Because we have already held that Judge Proctor served as an officer, director, trustee, or nonlegal advisor to Cycle Breakers, and because in that capacity, he permitted the use of the prestige of judicial office to acquire funds for Cycle Breakers, we hold that the Commission's finding of a willful violation of Canon 4(C) is not clearly erroneous, and we accept it.

*III. Coercion of Staff*

The Commission further found that Judge Proctor willfully violated Canon 3(B)(4) by coercing his staff into working for Cycle Breakers, Inc. Canon 3(B)(4) provides:

A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.

Ark.Code Jud. Conduct Canon 3(B)(4). Our review of the record reveals ample evidence that Judge Proctor's staff was required to work with and for Cycle Breakers.

Indeed, Captain Day testified that Judge Proctor told him that he had to attend Cycle Breakers events. He stated that he was the security for the staff at the Cycle Breakers meetings and that most of the Fifth Division staff attended the monthly, weekly, and Saturday meetings "[b]ecause we were told that we either be there or be fired" by Judge Proctor. He testified that staff were paid overtime by the county and then were later paid by Cycle Breakers for that work. He further stated that Judge Proctor ordered them to work for Cycle Breakers.

Kenny Haskin testified that "it was strongly encouraged that [staff] attend" Cycle Breakers meetings. Zane Chrisman testified that Judge Proctor requested that she pick up intensive probationers and "take them to class." She testified that at times she used her own car and other times she used Judge Proctor's car. She further testified that when she interviewed with Judge Proctor for her position as a law clerk, he and his then-law clerk talked to her about the fact that Cycle Breakers would be part of her job responsibilities. Specifically, she was told that she was required to work at the probationers' quarterly, mandatory meetings, which were held on Saturdays.

The foregoing testimony makes clear that Judge Proctor required his Fifth Division staff to work on Cycle Breakers matters. That being said, we disagree with the Commission that such conduct violates the plain language of Canon 3(B)(4). However, that is not to say that Judge Proctor's actions were not without a basis for disciplinary action. According to Ark. Jud. Discipline & Disability Comm'n R. 12(E), this court "may accept, reject, or modify in whole or in part, the findings and recommendation of the Commission." We, therefore, modify the Commission's finding. Specifically, we hold that the finding should be modified to read as follows:

> Judge Proctor willfully violated Canon 2 by requiring his staff to work for Cycle Breakers, Inc.

Canon 2, as already set forth, mandates that judges avoid impropriety and the appearance of impropriety, and the test for appearance of impropriety, as set forth in the commentary and above, is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired. It is evident to this court that Judge Proctor's requirement that his Fifth Division staff work for Cycle Breakers constituted such conduct. Accordingly, while we reject the Commission's finding that his conduct regarding his staff violated Canon 3(B)(4), we modify the Commission's finding to a willful violation of Canon 2.

## IV. Imposition of Civil Probation

As to its final findings, the Commission found that Judge Proctor willfully violated Canon 2(A) in two ways: (1) by failing to respect and comply with the law by ignoring and bypassing laws that were an impediment to his interest in Cycle Breakers, Inc.; and (2) by failing to respect and comply with the law by enforcing payment of "civil fees" from defendants with jail or

the threat of jail, knowing the money would go to his nonprofit corporation. Canon 2(A) provides:

A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Ark.Code Jud. Conduct Canon 2(A).

### A. Ignoring and Bypassing Laws

 Here, Judge Proctor conceded that he created "civil probation" in his court. He further admitted that, when expunging records, he erroneously sealed the records of some defendants who had been convicted of violent offenses.[10] In addition, Kim Williams, a deputy in the Division of Legislative Audit, testified that her office was asked to examine the dealings of the Fifth Division and Cycle Breakers. She testified that there was concern over Judge Proctor's assessment of probation fees. She testified, as follows:

[T]he Arkansas Codes [sic] allow a probation fee to be assessed and collected. And, in this instance, Judge Proctor's monthly probation fee was $40.00 and that was collected in their office, remitted to the County Circuit Clerk, who in turn turned that money over to the County Treasurer, which is to help offset the costs for the probation officers and the expenses that the County incurs. Then, there was a—later in 2006, Judge Proctor issued a Circuit Court order that half of these fees go to Cycle Breakers, Incorporated. Cycle Breakers, Incorporated had requested that half the fees, or a $20.00 fee, be assessed for a building fund so they could acquire a building. This was submitted to the Judge and he in turn issued an order saying that half these fees would now go to the Cycle Breakers program and half

to the County. Well, the Quorum Court objected to that because these fees, according to the law, are fees that go to the county. They're county public funds and the Constitution prohibits any public entity, like a county or a city, to give funds to a nonprofit organization, unless they are |₃₂providing some service for the county that they are not able to provide. And there was no agreement to that nature. It was our opinion that a Circuit Judge did not have the power to override a state law and we basically say that in the report, that those fees should never have gone to Cycle Breakers.

In addition, she testified that

there was a civil probation fee of $40.00 a month, and we could not find any statutory authority for a civil probation fee. There's the authority for the $40.00 probation fee but not if you're—if you're put on—there's no civil probation that we found in the laws. And this fee went to the program. This fee was not used as part of the probationary process. There were $100.00 fees for missing a meeting of the Cycle Breakers, drug testing fees, monitoring fees, adjudication monitoring fees [sic].

Tonia Goolsby also testified regarding the lack of statutory authority. She testified that she did not know what civil probation was. She stated that she asked Judge Proctor's law clerk for a statute on the process that was being used, but that the law clerk did not have one. She further testified that, likewise, she could not find any authority or statutory scheme authorizing the process.

In addition, Ms. Goolsby testified that she had concerns that people were facing hearings in front of Judge Proctor without

10. *See, e.g.,* Ark.Code Ann. § 16–93– 1207(b)(1) (Supp.2009).

proper representation by counsel. She testified that

> [t]he concern that I had was that typically, even in a contempt hearing, that there's some sort of I guess issuance of a piece of paper that indicates to everybody that that person is facing a hearing and it would be a show-cause type of paper or revocation hearing or something. And the person would come in and they would have an attorney—or even if they didn't have an attorney, if it was a contempt, they'd have an opportunity to say to the Judge why they were or were not in compliance. And then they might, you know, be taken into custody if the court found them in contempt. And it just seemed like in 5th Division the procedure was if you didn't comply in some way the court issued an arrest warrant for you, a letter to the jail for you to be held for whatever amount of time, and then you might be brought over on the jail docket. And I would look all those people up in court and they'd be in custody, they'd be there, they didn't have a lawyer, they didn't have a revocation. So what they were there on was a contempt matter but they'd already been in custody for 10 or 20 or 30 days. And the discussion was that they needed to owe and they needed to go to the meetings and what they were going to have to do to get out. And I spoke a number of times to the public defenders in that court and to Bill Simpson about the situation because I was concerned about that.

She further testified to concerns regarding the expungement of cases by Judge Proctor. She stated that she knew of cases that were sealed without a petition being filed. She stated that "[t]here were cases in which either someone asked the court or the court directly went ahead and entered an Order to seal those files, in which a petition was not filed or we were not notified." [11]

 It is clear to this court that, in addition to any other laws Judge Proctor may have ignored or bypassed, Judge Proctor created and imposed a new type of sentence—civil probation. However, sentencing is entirely a matter of statute in Arkansas, and a circuit court may only impose a sentence authorized by statute. *See Cross v. State*, 2009 Ark. 597, 357 S.W.3d 895. Moreover, a circuit court lacks the authority to sentence a defendant otherwise than in accordance with Chapter 4 of the Arkansas Criminal Code. *See id.* Based on the foregoing testimony before the Commission, it is evident that Judge Proctor ignored and bypassed, at a minimum, our sentencing laws and that such conduct did not promote public confidence in the integrity and impartiality of the judiciary. Accordingly, we hold that the Commission's finding of a willful violation of Canon 2(A) is not clearly erroneous, and we accept it.

### B. Enforcement of "Civil Fees"

 As noted, the Commission found that Judge Proctor willfully violated Canon 2(A) by failing to respect and comply with the law by enforcing payment of "civil fees" from defendants with jail or the threat of jail, knowing the money would go to his nonprofit corporation. A review of the record reveals plenty of testimony that Judge Proctor imposed fees, with jail or the threat of jail, knowing that they would go to Cycle Breakers.

Captain Day testified that Judge Proctor had a " 'pay or stay' thing." He testified that probationers either had to pay their fees or go to jail. He later stated that if a probationer had not paid a fine or

---

11. *See, e.g.,* Ark.Code Ann. § 16–90–904 (Supp.2009).

had not paid restitution, then that probationer ran the risk of being put in jail.

Sally Porter testified that Judge Proctor used an "adjudicative monitoring fee." She described the fee and its use, as follows:

It's where if you were sentenced—because Pulaski County jail was overcrowded, so therefore they couldn't go, you know, to jail. So Judge would assess them an adjudicative monitoring fee so that you could stay out until there was a bed available. I was responsible for that program. And the way it worked is once he let them stay out on the adjudicative monitoring fee, I placed their name on the list, they came into my office, got their cell number, their mom, their nearest contact numbers. And then once [I was notified] that there was a bed, I would contact that defendant and let them know and they had x-amount of hours to get here so that they could go to jail. But they had to pay every week until they did.

. . . .

If you didn't pay, then you go to jail. You pay or you stay.

Ms. Porter stated that she had seen defendants go to jail on show-cause days, with no attorney present and no court reporter. She further stated that people went on civil probation after their criminal cases were closed and still had to pay and appear for show-cause days.

Zane Chrisman described the civil-probation policy:

And then there was the civil probation policy that if—the way that that was pretty much set up was I think if you had paid all of your fees and you'd pretty much done everything that you were supposed to do during ... your probationary term that you could be eligible for civil probation. And at that point you would be allowed to have your file sealed, but then for the next year you would still be required to do the Cycle Breakers meetings. You just wouldn't have to show up with your probation officer every month.

She further testified that on show-cause days, the collection of fees included Cycle Breakers, Inc., fees. She stated that a defendant could still be paying Cycle Breakers fees even though his case was technically expunged.

Tonia Goolsby testified that there were "a lot of fees" going to Cycle Breakers. She stated:

[W]hen I first got into court I didn't know what Cycle Breakers meant. And so the defendants would be assessed to pay, for instance, "you owe $100.00 in fees and you owe $100.00 to Cycle Breakers." And I didn't really know what that meant and that just became— that was very common language in the court. And I started understanding over time that there was a division of collection for regular typical probation fees for Pulaski County and fees that were being assessed to the corporate entity of Cycle Breakers.

She testified that, many times, the fees were the subject of noncompliance for a probationer. She further testified that she saw Judge Proctor tell a defendant how much he owed and ask him if he had it. She stated that the defendant would then take cash out of his pocket and give it to a member of the court staff or the probation staff.

As already noted, Ms. Goolsby testified that the procedure in Fifth Division was very different from other divisions. During her testimony, Ms. Goolsby examined a docket sheet from Fifth Division that was admitted into evidence and reflected some notations. She testified that the notations indicated that, following the entry of an

order to seal in the case in 2005, a contempt of court warrant was sought for the defendant in August 2007. She further testified that more payments were indicated in October 2007, and that the docket further stated "Defendant is to pay $90.00 on CB and come back in a week or two weeks."

Finally, Judge Proctor testified that there were around twenty-nine probationers who would be monitored and from whom fees would be collected even though their cases were closed. He testified that they were still paying fees to a private corporation and being monitored by the court after their records had been sealed. He further conceded that some of them could have been jailed for civil contempt for fees they owed to Cycle Breakers or for restitution.

In light of this testimony before the Commission, we agree that Judge Proctor failed to respect and comply with the law and failed to promote public confidence in the integrity and impartiality of the judiciary when he enforced the payment of civil fees, knowing that the funds would go to Cycle Breakers. For this reason, we hold that the Commission's finding of a willful violation of Canon 2(A) on this basis is not clearly erroneous, and we accept it.

## V. Judge Proctor's Procedural Arguments

### A. Failure to Comply with Rule 11(A)

With respect to his procedural arguments, Judge Proctor first argues that the Commission's recommendation of removal should not be followed due to the Commission's noncompliance with Ark. Jud. Discipline & Disability Comm'n R. 11(A) (2007), which provides:

The Commission shall, upon receipt of the judge's response or upon expiration of the time to answer, schedule a pub-

lic hearing not less than thirty (30) nor more than forty-five (45) days thereafter, unless continued for good cause shown. The judge and all counsel shall be notified promptly of the date, time, and place of hearing.

Judge Proctor makes two assertions of error under Rule 11(A): (1) that the initial date for his hearing was set outside of the forty-five day limit; and (2) that he was not provided prompt and correct notice of a continuation of that hearing date because he was not personally notified and the notice provided to his attorneys did not specify the time and place of the hearing as required by the rule. His contentions do not warrant dismissal.

As an initial matter, our review of the record reveals that Judge Proctor's latter argument is not preserved for our review. On March 11, 2009, April 27, 2009, and May 22, 2009, Judge Proctor moved to dismiss the cases against him, asserting that the Commission failed to schedule his hearing within the time constraints of Rule 11(A). However, a review of those motions and his briefs in support reveals no mention of the Commission's failure to notify him personally, nor its failure to indicate the time and place of the hearing in its notice. Consequently, this court is precluded from reviewing those claims, as he has failed to preserve those arguments. *See Thompson, supra.*

We turn, then, to his former argument. Attached to Judge Proctor's initial motion to dismiss is a copy of a letter from the Executive Director of the Commission, which states, in pertinent part:

Pursuant to Rule 8 of the Rules of Procedure of the Arkansas Judicial Discipline & Disability Commission, on September 19, 2008, the Commission met and considered the allegations against you contained in the referenced complaints. The enclosed Statement of Al-

legations alleges or infers that you wilfully [sic] violated the Code of Judicial Conduct. The Commission found sufficient cause to proceed to a Formal |₃₈Disciplinary Hearing in accordance with Rule 11(D).

The finding of sufficient cause to proceed to a formal disciplinary hearing is not to be taken as any determination that you violated the Arkansas Code of Judicial Conduct.

The Commission requests that you, with your attorneys, be present at its January 16, 2009 meeting to discuss this matter in the Commission offices in Little Rock, Arkansas pursuant to Rule 11A of the Commission's rules. Please be present at 11:30 a.m.

Judge Proctor claims that this setting was not in accordance with Rule 11(A), as it was outside of the time constraints of the rule. He does not claim a violation of due process, but, instead, appears to claim that the Commission failed to strictly comply with its rule.

Judge Proctor is correct; the Commission clearly scheduled the date for the hearing prior to its receipt of the judge's response or the expiration of the time to answer. The letter sent by the Commission was dated October 28, 2008, and Judge Proctor's response to the statement of allegations was received by the Commission on November 17, 2008. According to the rule, the Commission should have then promptly scheduled the hearing not before December 17, 2008, but not later than January 2, 2009.[12] Thus, the Commission's scheduling did violate the rules, in two ways: (1) the Commission scheduled the hearing even before receiving the judge's answer or the expiration of time to answer; and (2) it scheduled the hearing outside of the time constraints of the rule.

That being said, this court has never held, nor do we now hold, that the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission require strict |₃₉compliance by the Commission. The Commission construes Judge Proctor's claim as a jurisdictional argument, as do we.[13] However, there is nothing contained within Rule 11(A) to suggest that its requirements are jurisdictional in nature. Nor has Judge Proctor pointed this court to any harm he suffered by the Commission's noncompliance. For these reasons, despite the Commission's failure to comply with Rule 11(A), Judge Proctor's argument is without merit.[14]

### B. *Failure to Comply with Rule 8(D)*

Judge Proctor next contends that the Commission failed to comply with Ark.

---

12. The forty-fifth day was January 1, 2009; however, that day was a holiday. Pursuant to Rule 6 of the Arkansas Rules of Civil Procedure, the Commission could have scheduled the hearing as late as January 2, 2009.

13. The Commission further asserts that the dates scheduled were agreed to by Judge Proctor's counsel; however, we note that there is absolutely nothing in the record that so demonstrates, nor was counsel for the Commission able to direct this court to such during oral argument. The Commission also makes the statement in its brief and referenced in oral argument that it is afforded discretion; we have never so held, nor do we now.

14. We note that we are troubled by the Commission's repeated failure to follow its own rules, as evidenced in this opinion and in *Simes, supra,* and we, therefore, take this opportunity to caution the Commission to follow its rules as written. While to date the Commission's noncompliance has not resulted in a violation of a judge's rights, the Commission should take pains in the future to follow its rules and to document its actions so as to preclude future allegations of rule violations and to better facilitate this court's review of alleged rule violations if and when those allegations are made.

Jud. Discipline & Disability Comm'n R. 8(D) (2007), which provides:

> Except upon good cause shown and with the approval of the Commission, no action other than dismissal of the complaint shall be taken as to any complaint about which the judge is not notified within ninety (90) days of the receipt of such complaint.

He claims that because he was never served with notice of case 2007–306, which involved allegations pertaining to the findings of the Legislative Joint Auditing Committee, that complaint should have been dismissed. He contends that, despite the Commission's dismissal of that case, certain findings of the Commission mirror statements within the report. Therefore, he claims, due process has been offended where the Commission made findings based upon a case of which he was not properly given notice.

The Commission counters, asserting that the opening of a case file on the report pursuant to Ark. Jud. Discipline & Disability Comm'n R. 8(A) merely triggered an investigation. It contends that once the investigation demonstrated grounds to proceed, Judge Proctor was notified of the complaint, he answered, and the case proceeded to a hearing. It avers that there was no prejudice in its consideration of the findings of the report and that the report merely formed the basis for further investigation, which led to the eventual formal statement of allegations.

It appears from the record that case 2007–306 did involve the legislative audit report. It is further evident from the record that the Commission composed a letter, dated September 24, 2007, to notify Judge Proctor of the complaint involving the audit by the Legislative Joint Auditing Committee. In addition, there is a document, dated July 18, 2008, entitled "Notice" that includes what appears to be the Commission's allegations against Judge Proctor and its recommendation to proceed to a probable-cause hearing. That document contains the following statement, under the heading "Findings of Legislative Audit":

> Many of the issues from the findings of the Legislative Joint Auditing Committee (August 1, 2007) are intertwined in the above listed issues. The findings and issues from that report will be part of the JDDC case against Judge Proctor. There are numerous areas of alleged judicial misconduct raised in the report.

On that same date, Judge Proctor filed a motion to dismiss, in which he asserted that he never received notice of case 2007–306.[15] In the motion, he argued that case 2007–306 should be dismissed pursuant to Ark. Jud. Discipline & Disability Comm'n R. 8(D). During a hearing held the same day, which was deemed an "initial appearance," Judge Proctor made the same argument. The Commission then voted to proceed to a probable-cause hearing and gave the Executive Director thirty days to respond to the motion to dismiss.

At the probable-cause hearing held October 10, 2008, the Commission denied Judge Proctor's motion to dismiss. However, following its deliberations on probable cause, the following colloquy was had regarding the report of the Legislative Joint Auditing Committee:

> COMMISSION MEMBER JAMISON: The Commission decided to dismiss findings of Legislative—
>
> COMMISSION MEMBER WILLIAMS: (Inaudible) didn't make any recommendations on Findings of Legislative Audit. There was no Canon that he alleged that he

---

15. Judge Proctor also asserted other arguments not relevant to this point.

violated on that. I thought that was what our vote was.

COMMISSION MEMBER JAMISON: I thought we voted to—to dismiss.

COMMISSION MEMBER MORRIS: We did.

COMMISSION MEMBER WILLIAMS: Oh, okay.

It is evident from the record that the Commission dismissed case 2007–306. Accordingly, we need not address Judge Proctor's Rule 8(D) argument because he received the relief he now requests, and the issue is, therefore, moot. *See, e.g., Henson v. Wyatt*, 373 Ark. 315, 283 S.W.3d 593 (2008) (per curiam). There remains still his argument that the use of the report during the Commission's deliberations on the remaining cases violated his due-process rights. However, a review of the record reveals that Judge Proctor's objections to the testimony of Kim Williams, the author of the report, and to the admission into evidence of the report itself, were not based on due process.

During the disciplinary hearing, the following colloquies took place:

COUNSEL FOR JUDGE PROCTOR: Your Honor, it's my understanding Ms. Williams is the one who conducted the legislative audit regarding the activities of Cycle Breakers. It's my understanding that that particular count has been dismissed and so, therefore, we do not see the relevance of this testimony that's going to be coming in at this point. If that count is dismissed, then why are we even dealing with it?

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: Your Honor, she's going to give information about the financial arrangements between Cycle Breakers and 5th Division and the Judge, which is clearly— part of the allegations are the connection between the Judge and his intimate dealings with Cycle Breakers. And that's part of the legislative audit report

and certainly is relevant to these proceedings.

COUNSEL FOR JUDGE PROCTOR: Well, the point is that particular count, as it relates to the legislative audit—there was a legislative audit that was conducted that found that there were various things that Cycle Breakers was doing. And so the Judge has made—obviously made some changes regarding that particular audit. And so—and if that particular count has been dismissed, then we don't really see the relevance of it, of her testimony.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: The only thing that was dismissed was there was a heading that just said Legislative Audit and it described what happened. It wasn't really an allegation. It was just a legislative audit, and so they didn't find that as an individual count to go forward on. However, everything she's going to testify to is directly relevant to the financial dealings of Cycle Breakers, the Judge's involvement, and the report as well is relevant.

CHAIRMAN JAMISON: I am going to allow this witness to testify.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: Thank you.

COUNSEL FOR JUDGE PROCTOR: Note my objection.

. . . .

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: Ms. Williams, I'm going to show you some documents. I'm going to show you what has been marked as Petitioner's Exhibit Number Fourteen (14). Can you identify that?

MS. WILLIAMS: Yes sir. This is the report that we issued after we did all of our fieldwork on the Cycle Breakers and the Court. This report was released on April 1st, 2007.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: And it's the official government report on this?

Ms. WILLIAMS: Yes. This is the official report. This is the report that we went over with Judge Proctor and it's on our website.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: I move to introduce Number Fourteen (14).

COUNSEL FOR JUDGE PROCTOR: Your Honor, we would object as far as with the admission of Exhibit Number Fourteen (14). Number one, this report contains conclusory legal statements, legal opinions, and also opinions about the ultimate issue. Ms. Williams is here to testify and she can certainly testify about what she was required to do or asked to do as far as findings are concerned. But to allow this report to come in would be—we certainly object to it on the grounds that the report contains legal conclusions and she's not a lawyer to give testimony about that. And also it goes to the ultimate issue that this counsel is asked to return.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: I don't believe it goes to the ultimate issue.

COUNSEL FOR JUDGE PROCTOR: And also it's hearsay, Your Honor. We would object to that.

COMMISSION'S DEPUTY EXECUTIVE DIRECTOR: It's a self-authenticating government document that's not hearsay. So that's not the problem. And it presents information to the panel that's helpful. Any legal conclusions, we are not asking that this to be [sic] binding upon the Committee [sic] at all. You have to apply it to the Canons. This is completely to do with accounting principles and we asked it to be allowed as evidence for the panel to consider in deciding whether the Canons have been violated.

CHAIRMAN JAMISON: I will overrule the objection. It will be admitted.

Nor, after reviewing Judge Proctor's motions to dismiss included in the record, of which there were several, does it appear that he ever sufficiently developed a due-process argument regarding the use of this report. Rather, he merely cited to the United States and Arkansas Due Process Clauses. This court has held that to preserve an argument for review, it must first be raised and sufficiently developed below. *See, e.g., Greenwood v. Anderson,* 2009 Ark. 360, 324 S.W.3d 324; *Stilley v. Supreme Court Comm. on Prof'l Conduct,* 370 Ark. 294, 259 S.W.3d 395 (2007). Accordingly, we are precluded from reaching the merits of Judge Proctor's due-process argument.

### C. Failure to Comply with Rule 11(F)

■ Judge Proctor next asserts that the Commission violated Ark. Jud. Discipline & Disability Comm'n R. 11(F) (2007), which provides, in pertinent part:

A factfinder other than the entire Commission shall, within sixty (60) days after the hearing, submit its findings and recommendation, together with the record and transcript of the proceedings, to the Commission for review and shall contemporaneously serve them upon the judge.

Judge Proctor contends that the Commission violated Rule 11(F) when its three-member panel, the fact-finder, delivered its opinion to the Executive Director, who then delivered it to the Commission, rather than the three-member panel delivering it itself. He asserts that this was an erroneous delegation of responsibilities in contravention of the rule and, therefore, this court should not entertain, much less follow, the Commission's recommendation of removal.

Again, it appears that Judge Proctor construes this rule as requiring strict compliance ₄₅and as being jurisdictional in nature. However, there is no indication by the language used in the rule that would require this court to dismiss the charges against Judge Proctor or reject the Commission's recommendation of removal due to the Commission's failure to strictly comply with the rule. Moreover, we cannot say that the three-member panel did not comply with the rule, where it submitted its findings and recommendations to the Commission using, what was in essence a messenger, here, the Executive Director. Judge Proctor's argument lacks any merit.

### D. Other Errors of Law

Judge Proctor asserts several errors under Ark.Code Ann. § 25–15–212(h)(4) of the Arkansas Administrative Procedure Act ("APA"). While this court has not previously addressed the APA's application in judicial-discipline matters, we have held that the Act is inapplicable in professional-conduct matters, because that committee is an administrative agency of this court and the rules for such proceedings are promulgated by this court. *See Wood v. Supreme Court Comm. on Prof'l Conduct*, 343 Ark. 696, 38 S.W.3d 310 (2001). While we cannot say that the Judicial Discipline and Disability Commission is an administrative agency of this court, this court was directed to promulgate the procedural rules for the Commission, and it did so. *See* Act 637 of 1989, § 9; *In re Rules of Procedure of the Arkansas Judicial Discipline & Disability Comm'n*, 298 Ark.App. 654 (1989) (per curiam). *See also Griffen v. Arkansas Judicial Discipline & Disability Comm'n*, 368 Ark. 557, 565, 247 S.W.3d 816, 822 (2007) ("Judicial

discipline and the procedures defining that process are clearly *sui generis* and unlike your typical administrative action that first must be reviewed in circuit court."). ₄₆Accordingly, we hold that the APA is inapplicable to judicial-discipline matters. Notwithstanding this holding, we will still address Judge Proctor's arguments, though not in the context of the APA.

#### 1. Findings based on prior, dismissed allegations

Judge Proctor contends that the Commission's recommendation of removal is affected by error because it based its findings on conduct that had been the subject of prior, dismissed allegations against him. Specifically, he cites to: (1) case 2004–282, which involved allegations by an anonymous individual regarding Judge Proctor's involvement with Mr. Davis and another probationer, Robert McGee, and which ended in dismissal on September 16, 2005;[16] (2) case 2005–265, which involved another anonymous complaint by a probationer that probation money was being stolen and questioned the payments to Cycle Breakers, and which resulted in dismissal on September 16, 2005, due to insufficient cause to proceed; (3) case 2005–308, which involved a complaint by Shirley Sims involving Judge Proctor's involvement with her brother, a probationer, and another probationer, and which resulted in a dismissal on January 20, 2006, due to insufficient cause to proceed; and (4) case 2006–117, which involved an anonymous complaint by a concerned trial lawyer involving Judge Proctor's civil-probation program, and which was dismissed on September 15, 2006, due to insufficient cause to proceed. He argues that the current allegations are barred by res judicata because they were ₄₇previously litigated and

---

**16.** While this hearing was one in which the Commission was to determine whether to dismiss or proceed to a probable-cause hearing, the record reflects that Judge Proctor waived the preliminary hearing and asked that the hearing be one on probable cause.

that it was entirely reasonable for him to assume that the Commission's prior dismissals were an indication that he was in compliance with the canons.

■ Judge Proctor's contentions are without merit. While it does not appear that this court has previously determined whether res judicata is applicable in judicial-discipline proceedings, it is clear to this court that it is inapplicable in the instant case. Res judicata is comprised of two facets, claim preclusion and issue preclusion. *See Council of Co–Owners v. Glyneu, LLC*, 367 Ark. 397, 240 S.W.3d 600 (2006). Claim preclusion bars the relitigation of a subsequent suit when five elements are met. *See id.* These include: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *See id.*

■ Collateral estoppel, or issue preclusion, bars the relitigation of issues that were actually litigated by the parties in a previous suit. *See id.* The issue must have been previously litigated and determined by a valid and final judgment, and the following four elements must be met: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been

actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *See id.* In addition, the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue. *See id.*

■ Neither claim preclusion nor issue preclusion applies to Judge Proctor's case. Here, none of the four prior cases cited by or relied upon by Judge Proctor proceeded to a formal ⌊48 disciplinary hearing. Instead, each was dismissed due to insufficient cause to proceed. Indeed, three of the four never reached a probable-cause determination. Again, with respect to claim preclusion, the first suit must have resulted in a final judgment on the merits. None of the four prior cases against Judge Proctor resulted in a final disciplinary hearing with a final judgment on the merits. A dismissal based on insufficient cause to proceed in no way equates to a final judgment on the merits. Accordingly, claim preclusion is inapplicable.[17]

■ Nor does collateral estoppel, or issue preclusion, apply, as it requires the issue to have been actually litigated. Because all four prior cases against Judge Proctor were dismissed due to insufficient cause to proceed, none were actually litigated. In addition, we are not persuaded

---

17. Nor is Judge Proctor's citation to *Bockman v. Arkansas State Med. Bd.*, 229 Ark. 143, 313 S.W.2d 826 (1958), persuasive, as it is distinguishable from the instant case. In *Bockman*, an administrative appeal, a prior complaint had been filed with the state medical board that Dr. Bockman's license should be revoked on the ground that he had been convicted of crimes of moral turpitude. However, the Board declined to revoke his license, holding that the proof of identity was insufficient and that in any event the offenses did not involve moral turpitude. On certiorari, the circuit court did not disturb the Board's findings,

and no appeal was taken to this court. This court held that that decision was correctly relied on as a complete bar to the pending proceeding, as the pending complaint alleged the same New York convictions.

It is clear from *Bockman* that a final judgment on the merits was had by the state medical board in the prior proceeding. That is not the case here, where the prior complaints never proceeded to a formal disciplinary hearing on the merits of those complaints. Accordingly, Judge Proctor's reliance on the *Bockman* case is misplaced.

by Judge Proctor's assertion that he was entitled to believe that his actions were permissible due to the Commission's prior dismissals. While it dismissed the prior complaints due to insufficient cause to proceed, the Commission made no final, evidentiary finding regarding the propriety of Judge Proctor's actions. Accordingly, we hold that Judge Proctor's claims on these bases are without merit.

### 2. Discovery rulings

Judge Proctor further asserts that the Commission's recommendation of removal is tainted by the Commission's erroneous rulings on three discovery matters. Specifically, he contends that he was prejudiced by three violations of discovery by the Commission, alleging: (1) that the Commission failed to provide him access to the file in case 2005–265, which contained statements by Alice Abson regarding his alleged conduct and civil probation; (2) that he was never provided access to the case file in case 2005–308, which contained a notice recommending dismissal of that complaint due to Judge Proctor's agreement to change his procedures; and (3) that the Commission failed to produce certain documents relating to Tonia Goolsby and Bruce Engstrom. According to Ark. Jud. Discipline & Disability Comm'n R. 11(B) (2007), the judge and the Commission shall be entitled to discovery in accordance with the Arkansas Rules of Civil Procedure.

Judge Proctor, while claiming he was prejudiced by the discovery violations, has failed to demonstrate to this court how his defense would have differed had he received the above referenced documents in a more timely fashion. Notwithstanding his failure to so demonstrate, we have been unable to find any prejudice to Judge Proctor relating to these discovery violations during our de novo review of the record before us. Because there is no basis for prejudice relating to these discovery matters, Judge Proctor's claims are without merit. *See, e.g., Banks v. Jackson,* 312 Ark. 232, 848 S.W.2d 408 (1993).

### 3. Failure to recuse

Judge Proctor also asserts that the Commission's recommendation should not be followed because it is affected by "error or law" because Commission members failed to recuse. He avers that recusal was required when: (1) the Commission, after finding probable cause, erroneously allowed the Executive Director to prepare the findings and to sign them on behalf of the Commission's chairman, which he claims constituted an impermissible commingling of prosecutorial and adjudicatory functions; (2) the Commission failed to notify him of any open and public session in which it announced its final action, when he had specifically requested to be present at all hearings; (3) the Commission members that voted to approve an extraordinary filing with this court subsequently sat as adjudicators after that vote; and (4) Commission member Larkowski had cases pending before Judge Proctor at the time he sat as a member of the three-member panel and full Commission.

This court has held that, in cases where judges have been asked to disqualify, judges are presumed to be impartial, and the person seeking disqualification bears a substantial burden in proving otherwise. *See Judicial Discipline & Disability Comm'n v. Thompson,* 341 Ark. 253, 16 S.W.3d 212 (2000). We have further held that the decision to recuse is within the trial judge's discretion, and it will not be reversed absent abuse. *See id.* Here, Judge Proctor has wholly failed to present this court with any evidence to show or prove bias on the part of any Commission member, nor has he demonstrated that any Commission member

abused his or her discretion in failing to or deciding not to recuse. Further, the Commission's recommendation of removal in no way evidences proof of bias. Accordingly, Judge Proctor's arguments lack merit.

### E. Violations of Constitutional Provisions

■ Judge Proctor next asserts that it was constitutionally impermissible for the Commission to allow the Executive Director to prepare and sign its findings of fact, and, further, that there was an impermissible commingling of investigatory and adjudicative responsibilities when the Commission authorized the Executive Director to file an extraordinary petition with this court. He then makes the bare allegation that the Commission violated his due-process rights.

This court has held that state judges have protected due-process rights, the basic components of which are fairness, meaningful notice of charges, and a meaningful opportunity to defend oneself. *See Judicial Discipline & Disability Comm'n v. Simes,* 2009 Ark. 543, 354 S.W.3d 72. Here, Judge Proctor's argument is based solely on one citation to authority, *Nightlife Partners, Ltd. v. City of Beverly Hills,* 108 Cal.App.4th 81, 133 Cal.Rptr.2d 234 (2003). There, the California Court of Appeal, Second District, Division 3, held that the petitioner's due-process rights were violated when the City's advocate for the initial denial of petitioner's renewal application acted as a legal advisor to the hearing officer reviewing that denial. The facts in that case are in no way similar to the facts before us here.

The record reflects that the Executive Director signed, for Chairman Jamison, a letter to Judge Proctor certifying the allegations for which the Commission found probable cause to proceed.[18] Additionally, the record includes the sealed petition filed with this court on April 23, 2008.

Arkansas Judicial Discipline & Disability Commission Rule 9(E)(3) (2007) provides, in pertinent part, that

> [i]f [the Commission] finds, by concurrence of a majority of members present, that there is probable cause to believe that there has been misconduct of a nature requiring a formal disciplinary proceeding, the *director* shall cause the judge to be served with the report, the formal statement of charges, the record of the probable cause determination, and all documents upon which the determination was based.

(Emphasis added.) If, according to the rule, the director shall cause service on the judge of the findings following probable cause and other items, we cannot say that it was in any way unfair, or otherwise violative of due process, for the Executive Director to sign the letter stating the findings on behalf of the chairman with his permission and to so indicate. Judge Proctor's argument on this issue fails.

With respect to the extraordinary petition filed with this court, we, again, see no due-process violation. Rule 10(A) of the 2007 Rules of Procedure of the Arkansas Judicial Discipline & Disability Commission provides that

> [i]n instances of the (1) filing of an indictment or information charging a judge with a felony under state or federal law, or (2) the filing of a misdemeanor charge against a judge or justice where his ability to perform the duties of his office is adversely affected, the Commission shall convene within ten (10) days for the purpose of considering a recommendation to the Supreme Court that the judge or justice be temporarily sus-

---

18. The signature reflected "Leon Jamison by DAS."

pended with pay pending the outcome of any disciplinary determination.

Rule 10(B) further provides that "[a] temporary suspension with pay as an interim sanction shall not preclude action by the Commission with respect to the conduct that was the basis for the felony or misdemeanor charge, nor shall the disposition of the charge in any manner preclude such action." Ark. Jud. Discipline & Disability Comm'n R. 10(B) (2007).

If the Commission may convene to make such a petition to this court in certain circumstances, we cannot say that the Commission's convening in the instant case was in any way a violation of due process. While there was no filing of any charges against Judge Proctor pursuant to the rule that precipitated the Commission's filing in Judge Proctor's case, the rules clearly contemplate the Executive Director filing pleadings with this court only after the Commission has convened and rendered a recommendation, even prior to any action by the Commission with respect to the conduct. Accordingly, Judge Proctor's argument on this issue, too, is without merit.

### F. Prejudice of Substantial Rights

For his final procedural argument, Judge Proctor, relying on the APA, asserts that he has a substantial right to due process, which was prejudiced: (1) when he was required to defend against a complaint about which he was never properly noticed and which was ultimately used as a primary basis for the recommendation of removal; (2) when he was denied the right to a prompt and speedy resolution of this matter; (3) by the procedures followed by the Commission that gave the Executive Director a distinct advantage; and (4) by the fact that the Commission made findings on the same allegations it had previously dismissed.

We cannot say that any of these issues raises due-process concerns. Again, as we have held in this case, the APA does not apply in judicial-discipline cases. But notwithstanding the inapplicability of the APA, we again note that state judges do have protected due-process rights, the basic components of which are fairness, meaningful notice of charges, and a meaningful opportunity to defend oneself. *See Simes, supra.*

That being said, each of Judge Proctor's arguments has been rejected for the previously stated reasons, and we cannot say, after examining the record before us, that Judge Proctor was in any way deprived of a fair hearing, meaningful notice, or a meaningful opportunity to defend in violation of his due-process rights. While the methods followed by the Commission may have sometimes deviated from the procedures set forth by this court, none of the Commission's departures from procedure rendered Judge Proctor's hearing unfair so as to constitute a due-process violation. Accordingly, we reject Judge Proctor's arguments on this issue.

### VI. Sanction

We must now determine the appropriate sanction and decide whether to accept the Commission's recommendation of Judge Proctor's removal. This court has recognized certain factors to be considered in determining the appropriate sanction for judicial misconduct, including: (1) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (2) the nature, extent, and frequency of occurrence of the acts of misconduct; (3) whether the conduct occurred in or out of the courtroom; (4) whether the misconduct occurred in the judge's official capacity or in his private life; (5) whether the judge has acknowledged or recognized that the acts occurred; (6) whether the judge has

evidenced an effort to change or modify his conduct; (7) the length of time of service on the bench; (8) whether there have been prior complaints about this judge; (9) the effect the misconduct has upon the integrity of and respect for the judiciary; and (10) the extent to which the judge exploited his position to satisfy his personal desires. *See Thompson, supra.*

Here, the record clearly reflects that Judge Proctor's conduct was not an isolated instance, but instead evidenced a pattern of conduct. Undoubtedly, Judge Proctor believes his actions were taken with a sincere desire for better, but we cannot ignore the repeated instances of his poor judgment. In addition, Judge Proctor's misconduct was of a grave nature, in that it clearly affected the public's perception of the judiciary's impartiality, and it occurred on a frequent, and often repeated, basis. His actions took place, as set out above in length, both in and out of the courtroom, and they occurred both in his official capacity and in his private life.

While Judge Proctor has fully admitted that the acts occurred, it does not appear that he has evidenced a steadfast effort to change or modify his conduct. Indeed, despite repeated investigations and Judge Proctor's protestations that he would change his behavior, he continued to utilize the Cycle Breakers program even though his involvement with the Cycle Breakers program was under scrutiny.

At the time of this writing, Judge Proctor will have served as circuit judge for nine years, as he took office on January 1, 2001. While there have been previous complaints against Judge Proctor, as outlined in this opinion, it appears that they were dismissed by the Commission, after Judge Proctor agreed to effect changes in his conduct. However, it is evident to this court that Judge Proctor's misconduct has had an effect on the integrity of and respect for the judiciary. Finally, we must consider the extent to which Judge Proctor exploited his position to satisfy his personal desires. While some might consider Judge Proctor's motives admirable in that he only sought goals of rehabilitation, both the testimony before the Commission and Judge Proctor's actions themselves clearly demonstrate that he used his position as a judge to further his personal desires and goals.

On a final note, Judge Proctor has steadfastly maintained to this court that his intentions were nothing but true. While that may be, good or true intentions do not absolve a judge of his or her ethical duties under the canons. As the Preamble to our Code of Judicial Conduct provides:

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. *Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system.* The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

Preamble, Ark.Code Jud. Conduct (emphasis added).

Arkansas Code Annotated § 16–10–410(b)(5) (Supp.2009) provides, in pertinent part, that "[a] judge may be removed from office ... [for a w]illful violation of the Arkansas Code of Judicial Conduct[.]" Because we have accepted the foregoing findings of willful violations of the judicial canons, we hereby order Judge Proctor removed. Pursuant to Ark. Jud. Discipline & Disability Comm'n R. 12(E), we

direct that no motion for rehearing will be entertained and that this decision shall be final upon filing.

Recommended findings accepted in part, modified in part, rejected in part; [57]recommendation of removal accepted; removal ordered.

Special Justice TONYA ALEXANDER joins.

BROWN, J., and Special Justice PAUL KEITH concur.

WILLS and SHEFFIELD, JJ., not participating.

ROBERT L. BROWN, Justice, concurring.

I agree with the majority opinion but write separately to add some additional thoughts. As an initial matter, I too am concerned about the Commission's recurrent noncompliance with its own rules as expressed in the majority's footnote. Although this court has yet to find that the Commission's failure to comply with one of its procedural rules violates a judge's rights so as to require dismissal or other action, the noncompliance plainly undermines the confidence in the judicial-discipline process.

In this case, for example, Judge Proctor alleged that the Commission failed to follow three of its procedural rules: Rules 11(A), 8(D), and 11(F). The majority finds, and I agree, that Judge Proctor failed to preserve his argument on Rule 8(D). On the other hand, for Rules 11(A) and 11(F), this court rejected Judge Proctor's argument that the Commission's procedural rules were jurisdictional in nature and thus required strict compliance. Judge Proctor, however, did not claim that the Commission's failure to comply with its procedural rules violated his due-process rights.

I note that a number of other courts have addressed the issue of noncompliance with procedural rules in judicial-discipline proceedings and concluded that dismissal is not warranted in the absence of a showing from the judge that the noncompliance prejudiced [58]that judge and denied him or her due process of law. *See, e.g., McCartney v. Comm'n on Judicial Qualifications,* 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268 (1974) ("relief from the deleterious effect, if any, of the Commission's failure to follow [its procedural rules] may be secured by petitioner only upon a showing of actual prejudice"; no such prejudice shown where judge received adequate notice of charges and reasonable time to prepare his defense) *overruled on other grounds by Spruance v. Comm'n on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975); *In re Kirby,* 354 N.W.2d 410 (Minn.1984) (The failure of the Board of Judicial Standards to give Judge an opportunity to respond to each allegation constituted a breach of its own procedural regulations but was not "so violative of due process as to raise the concern that fundamental fairness may not have attached."); *In re Storie,* 574 S.W.2d 369 (Mo.1978) (Judge could not be heard to complain of the Commission on Retirement, Removal and Discipline's irregular compliance with its informal notice rule, absent a showing of prejudice.); *In re Hill,* 152 Vt. 548, 568 A.2d 361 (1989) (Judge could not show prejudice stemming from the Judicial Conduct Board's failure to comply with procedural rule requiring that the judge have an opportunity to respond during a preliminary investigation where the judge received full notice of the charges and an opportunity to respond.).

I agree with this line of authority. The Commission's noncompliance with its own procedural rules should only entitle a judge to relief upon a showing of actual

prejudice to the judge's due-process rights to meaningful notice and an opportunity to defend oneself. Notice and a hearing are rights specifically given to judges by amendment 66(c) to the |₅₉Arkansas Constitution. Upon a showing of actual prejudice, when those rights have been impaired, relief to the accused judge in some form should be afforded.

As a second point, Judge Proctor points to several actions of the Commission that he alleges evidence an impermissible commingling of investigative and adjudicatory functions by its members. I would simply note that this argument, without a further showing of the deleterious effect of combining the roles, has consistently been rejected in the context of judicial-discipline proceedings. *See, e.g., Kloepfer v. Comm'n on Judicial Performance,* 49 Cal.3d 826, 264 Cal.Rptr. 100, 782 P.2d 239 (1989); *In re Zoarski,* 227 Conn. 784, 632 A.2d 1114 (1993); *Nicholson v. Judicial Retirement & Removal Comm'n,* 562 S.W.2d 306 (Ky.1978); *Matter of Mikesell,* 396 Mich. 517, 243 N.W.2d 86 (1976); *In re Elliston,* 789 S.W.2d 469 (Mo.1990). In addition, the Supreme Court held in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation" and gave the following illustrations:

> Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making

the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction. It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law. We should also remember |₆₀that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around.

*Id.* at 57, 95 S.Ct. 1456.

For this reason, I agree with the majority on this issue as well.

Special Justice PAUL KEITH joins.